**CITY OF SPRINGFIELD, Appellee,**

**v.**

**PULLINS, Appellant.**

[Cite as *Springfield v. Pullins* (1998), 130 Ohio App.3d 346.]

Court of Appeals of Ohio,
Second District, Clark County.

No. 97–CA–101.

Decided Oct. 16, 1998.

348

*Michael F. Sheils*, for appellee.

*Edwin A. Grinvalds*, for appellant.

BROGAN, Judge.

This case is before the court on the appeal of Jerry Pullins from a conviction for failing to provide a refuse hauler licensed by the city of Springfield, Ohio for weekly solid waste pickup, in violation of Springfield Codified Ordinances 919.051. Following the conviction, Pullins was fined $100 plus court costs. In support of his appeal, Pullins raises the following assignments of error:

"I. The trial court erred as a matter of law in upholding the strict liability municipal ordinance as constitutional where it is overly broad and vague, under the First Amendment to, and the due process clause of the Fourteenth Amendment to, the United States Constitution.

"II. The trial court erred as a matter of law in admitting hearsay testimony under the business record exception where the witness was available and the evidence proved an essential element of the crime in contravention of Appellant's right to confrontation under the Sixth Amendment to the U.S. Constitution and best evidence rule.

"III. The trial court erred as a matter of law in finding a violation of the municipal ordinance where it was against the manifest weight of the evidence."

After briefly outlining the factual background of this case, we will discuss each assignment of error.

I

Jerry Pullins is the owner of about eighty-five rental properties in the city of Springfield, Ohio, plus a commercial property called Cooper Appliance. One of the properties was located at 303 South Plum Street and consisted of three rental units. For trash pickup for this property, Pullins contracted with Rumpke Waste Systems, at a price of $11.75 per month. Based on this price, Rumpke would pick up no more than ten trash bags per week. Therefore, if more than ten bags of trash were placed at the curb, Rumpke would leave the additional bags. Pullins passed the cost of trash pickup to his renters by adding thirteen or

fourteen dollars to their monthly rental charges. Thus, for the Plum Street property, the amount of rent attributable to trash pickup would typically have been more than three times the amount of the trash fee. Pullins's testimony, however, was that he operated at a loss in the area of trash services because, at times, he had to pay for extra trash removal service when a tenant left and additional cleanup was needed.

The citation issued in this case stated that Pullins had violated Springfield Codified Ordinances 919.051 on June 2, 1997. Section 919.051 provides:

"On and after January 1, 1997, no owner of real property within the City upon which living quarters are, or have been, maintained and in which garbage or refuse, or both, are created shall fail to provide, by written contract, or otherwise, for the collection of all such garbage or refuse from the premises by solid waste collectors licensed by the City pursuant to Chapters 921 and 922 of the Codified Ordinances of the City of Springfield, Ohio."

The ordinance does not specifically define "refuse," but "garbage" is defined as "all waste matter, solid, liquid, or mixed, which attends, exists, is created or accumulates within the City from the preparation, cleaning, cooking, use, storage or sale or dealing in meats, fish, fowl, fruits, vegetables, cereals, grain or other animal, vegetable or mineral matter designed or intended as foodstuffs for human consumption, but does not include dangerous substances." Springfield Codified Ordinances 919.01(b). Solid waste is defined as "garbage, rubbish and such other unwanted residual materials as result * * * from domestic operations; * * * [and] includes bulky items such as automobiles, furniture, bed springs, and large appliances." Springfield Codified Ordinances 919.01(a). Similarly, "rubbish" under the city ordinances means "all natural refuse resulting from the use of any premises as a residence, such as furniture, appliances, parts of furniture or appliances, ashes, paper, tin cans, bottles, brush, grass, leaves or other similar substances, or containers." Springfield Codified Ordinances 919.01(c).

Various sections of the city ordinances impose duties on property owners for waste disposal. For example, Section 919.02 requires every person who is an owner or tenant of premises to prepare all solid waste for collection in plastic or metal containers. Similarly, Section 919.03 requires the solid waste to be placed along the designated collection route. Further, Section 919.03 says that no solid waste may be placed in the curb area prior to one hour before sunset on the day before collection. Empty containers must also be removed before sunset on the day collection is made.

According to Section 919.04, every person who is the owner or tenant must have all solid waste collected and disposed of on at least a. weekly basis. Additionally, the owner or tenant is not permitted to allow persons who are not within the categories listed in Section 919.04 (sanitation services public utility,

residential haulers, commercial hauler serving the premises, or the city) to collect and dispose of any solid waste accumulating on the premises. Consistent with the contents of Section 919.04, Section 919.05 says that no owner or tenant of any premises shall allow solid waste to accumulate on his premises or on any public way adjacent to the premises for a period in excess of one week.

Before June 2, 1997, the Clark County Combined Health District had received several complaints about the property at 303 South Plum. Warnings had been given to Pullins twice in 1996. The sanitarian from the health district who testified said he had spoken to Pullins's office four or five times over the preceding two years about trash. When he called, the problems were taken care of eventually, but not always within a week.

Carol Grubb, who lived near the Plum Street property, called the health district on June 2, 1997, to complain about trash being left in front of the premises all week. According to Grubb, who had lived on Plum Street for three years, trash was piled up in front of Pullins's property on a weekly basis. The regular trash pickup day was Friday, and some bags would be taken, but others would be left. Typically, trash at that property was put out on Wednesday, even though trash collection was not until Friday. On Friday afternoon, after trash collection, trash still sat by the curb. The trash would then be removed between Tuesday and Wednesday of the next week, and more trash was back out again on Wednesday. This was not an intermittent series of events, but was ongoing.

Before complaining to the health district, Grubb called Pullins in an attempt to get his cooperation. Generally, when called, Pullins picked up the trash within three or four days. Finally, after seeing fifteen to twenty bags left by Rumpke (Pullins's trash hauler), and learning that Rumpke had orders to pick up trash bags from only one unit (ten bags), Grubb filed four complaints in a month with the health district. One complaint was on June 2, 1997, based on the trash pickup that had taken place on May 30, 1997. According to Grubb, some trash was picked up that day, but by Monday, June 2, 1997, a number of bags were still sitting by the curb. Rumpke's records for that particular trash day indicate that ten bags were picked up and eight were left at the premises.

When the health district sanitarian went out to the South Plum Street property on June 2, about a half dozen trash bags were sitting on the curb. Consequently, Pullins was sent a warning. Several days later, trash was still there. As a result, the sanitarian issued a citation to Pullins on Tuesday, June 10, 1997, for the violation on June 2.

Pullins testified that when he received a complaint from a neighbor about trash in the yard at 303 South Plum Street, he asked his employees to stop by and clean it up. Because trash was always in the yard of that property, eventually Pullins had his employees automatically stop on Monday or Tuesday. His

employees cleaned up the trash and took it down to a dumpster at Pullins's appliance store. This dumpster was then emptied by a licensed trash hauler. Although Pullins said the trash his men picked up was yard trash that might not have come from his own tenants, he did admit that his employees also picked up the extra trash bags left by Rumpke. These bags were also placed in the dumpster at the appliance store. Pullins admitted that if he wanted all the trash at 303 South Plum Street to be picked up, he would simply have to pay an additional fee to Rumpke. The reason Pullins did not contract for more than ten bags was that he felt ten bags was a sufficient amount to allow for the three units. Pullins did say that Rumpke would not pick up leaves or large metal items.

Based on the above evidence, the trial court found Pullins had violated Section 919.051 by failing to have a sufficient contractual arrangement to haul the trash from the site on the day in question. As a result, Pullins was fined $100 plus costs.

■ Pullins's first argument on appeal is that Section 919.051 violates the Due Process Clause because it is vague and overly broad. In this context, Pullins claims that even a property owner's otherwise lawful removal of refuse to another collection site is a violation. For example, the ordinance requires removal of garbage and refuse. However, refuse was not defined. Under the dictionary definition relied on by the trial court, refuse may include items like old furniture, broken appliances, and leaves. According to Pullins, these items are not picked up by solid waste collectors. Yet if a property owner uses the common method of taking these items by truck to a junk yard, he may violate the ordinance. A further alleged defect is that the ordinance subjects property owners to criminal liability for the conduct of others. Thus, as in the present case, even if an owner has a contract with a hauler to pick up a reasonable number of bags, a violation can occur if people from other properties unlawfully dump their trash at the owner's curb.

■ The city has not responded to this assignment of error other than to claim that it was waived by Pullins's failure to specifically raise the issue before or during trial. No pretrial motions were filed, and both sides waived opening statements. At the end of the case, the city argued that the ordinance required Pullins to have all trash hauled away, not to have someone come in and haul the trash to another location. In response, the defense contended that if the court adopted the prosecutor's position, the ordinance would be unconstitutional on its face. The defense's reasoning was that if what Pullins did in removing trash to another dumpster or taking scrap metal to a third party was a violation, every major owner of residential real estate would violate the statute. In particular,

the defense pointed out that Rumpke did not pick up leaves or major items like dishwashers.

After hearing these arguments, the trial court reviewed the wording of the ordinance and noted that "refuse" was not defined. The court then looked to the dictionary definition of refuse, which was "anything thrown away or rejected as worthless or useless, waste, trash, rubbish." Using this interpretation, the court concluded that if more trash exists than has been contracted for, the owner has the burden to provide for it to be hauled away, and can violate the ordinance if he does not do so. Although Pullins had made what the court called "significant steps" to remove trash, he did not have a sufficient arrangement for a licensed hauler to collect the trash from the Plum Street premises at the time of the citation.

Although the constitutional claims could have been more precisely raised below, we believe that the issues considered by the trial court were similar enough to the first assignment of error to avoid application of the waiver doctrine. Consequently, we will consider the constitutional arguments raised by the defense. We begin with the observation that "[i]t is fundamental that Ohio's cities are authorized to regulate local sanitation." *Portsmouth v. McGraw* (1986), 21 Ohio St.3d 117, 119, 21 OBR 422, 423, 488 N.E.2d 472, 473. In *McGraw*, the Ohio Supreme Court noted:

"Without the ability to require every resident of the city upon whose premises garbage or refuse accumulates to conform to a uniform regulation, the city would be unable to tackle all the health problems which would result from a helter-skelter approach of allowing each citizen to individually strew his garbage throughout the city as he sees fit." *Id.* at 121, 21 OBR at 425, 488 N.E.2d at 475.

The law is also settled that "private property is held subject to the general police power of a state and may be regulated pursuant to that power." *State v. Anderson* (1991), 57 Ohio St.3d 168, 169, 566 N.E.2d 1224, 1225. Statutes promoting public health, safety, and welfare "enjoy a strong presumption of constitutionality," with the challenger being required to prove his assertions beyond a reasonable doubt. *Id.* at 171, 566 N.E.2d at 1226.

To prove a claim that a statute is void for vagueness "the challenging party must show that the statute is vague 'not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all. * * *' *Coates v. Cincinnati* (1971), 402 U.S. 611, 614 [91 S.Ct. 1686, 1688, 29 L.Ed.2d 214, 217]. In other words, the challenger must show that upon examining the statute, an individual of ordinary intelligence would not understand what he is required to do under the law. Thus, to escape responsibility * * * [the

defendant] must prove, beyond a reasonable doubt, that the statute was so unclear that he could not reasonably understand that it prohibited the acts in which he engaged." *Id.*

The Ohio Supreme Court has also indicated that the values implicated in the void-for-vagueness doctrine are "first, to provide fair warning to the ordinary citizen so behavior may comport with the dictates of the statute; second, to preclude arbitrary, capricious and generally discriminatory enforcement by officials given too much authority and too few constraints; and third, to ensure that fundamental constitutionally protected freedoms are not unreasonably impinged or inhibited. Proper constitutional analysis necessitates a review of each of these rationales with respect to the challenged statutory language." *State v. Tanner* (1984), 15 Ohio St.3d 1, 3, 15 OBR 1, 3, 472 N.E.2d 689, 691.

After evaluating Section 919.051 under these standards, we find that Pullins did not meet the necessary burden of proof. As we noted above, the ordinance states that if garbage or refuse is created on property where living quarters exist, the owner of the property must provide for collection of all such garbage and refuse from the premises by solid waste collectors licensed by the city. Although Pullins argues that the statute is vague because "refuse" is not defined, we believe "refuse" was sufficiently defined to alert a person of ordinary intelligence as to its meaning, particularly since this section of the city ordinances need not be read in isolation.

Specifically, Chapter 919 deals with sanitary services and what property owners must do to comply with city requirements. As we mentioned earlier, owners have a number of obligations, including placing all solid waste accumulating on the premises in containers for collection, placing the containers curbside, and arranging for the removal of the solid waste from the premises by licensed solid waste collectors. "Solid waste" is defined by the ordinances to include all garbage, rubbish, and other unwanted residual materials from domestic operations. The definition of "rubbish" is "all natural refuse resulting from the use of any premises as a residence." This definition also gives a number of examples like furniture, appliances, leaves, tin cans, and paper. Thus, by reading the entire regulations, a person of ordinary intelligence could understand the meaning of refuse. However, even if resort to a dictionary definition is needed, we note that "refuse" is used interchangeably with "garbage" and "rubbish." Merriam Webster's Collegiate Dictionary (10 Ed.1993) 984. Again, we believe a person of ordinary intelligence would understand that a property owner's obligation under the ordinances is to have a licensed solid waste collector remove all trash from the premises, including paper, food debris, leaves, furniture, and any other unwanted or discarded item.

In the present case, Pullins understood the obligation to have all trash removed, but instead chose, presumably for financial reasons, to contract for a restricted number of bags. His own testimony, in fact, indicated his awareness that he could comply with the requirements simply by spending more money. Furthermore, the assertion in Pullins's brief that items like leaves, broken furniture, and appliances are not picked up by solid waste collectors is not supported by the record. While Pullins testified that Rumpke did not pick up leaves or large metal items, he did not say that no other available licensed waste collectors would pick up these items. Other licensed haulers did exist, as Pullins testified that he contracted with a hauler other than Rumpke for removing trash from vacated apartments.

As an additional matter, we are not persuaded by Pullins's claim that the ordinance is defective because a property owner can conceivably be prosecuted for taking a broken appliance to a dump rather than having a licensed hauler come to the premises. In the first place, the ordinance itself does not provide for discriminatory or arbitrary enforcement, which are the ills designed to be remedied under the vagueness doctrine. Instead, property owners must use licensed haulers to remove all garbage and refuse from the premises, meaning that the ordinance extends equally to all situations. Thus, while one might question the city's wisdom in drafting the ordinance so broadly, that does not mean that the ordinance itself allows selective or arbitrary enforcement. Furthermore, the issue in vagueness challenges is not whether the ordinance is vague in all applications. Rather, "[w]hen the vice of a statute is its vagueness, the litigant asserting the vagueness defense must demonstrate that the statute in question is vague as applied to the litigant's conduct without regard to its potentially vague application to others." *In re Complaint Against Harper* (1996), 77 Ohio St.3d 211, 221, 673 N.E.2d 1253, 1262.

In the present case, Pullins was not being prosecuted because he hauled a broken appliance to the dump. To the contrary, the prosecution arose from the fact that the contract with Rumpke was not sufficient to allow all of the trash bags to be picked up from the property owned by Pullins. Pullins admittedly knew the ten-bag contract was insufficient, as he sent employees to the property on numerous occasions, not just to pick up yard debris, but also to pick up extra bags left by Rumpke. The testimony of a neighbor was that trash was routinely put out early, on Wednesday, for the Friday pickup. However, the extra garbage bags were not picked up until the following Tuesday. Pullins himself testified that his employees normally checked the property on Monday or Tuesday. The upshot of this process was that trash would have been sitting outside the premises almost continuously. As we mentioned above, the presence of trash bags at the curb on the day of the violation was not an isolated occurrence.

The obvious purpose of Chapter 919 is to prevent health hazards by requiring property owners to contract with licensed haulers for periodic removal of solid waste from their property. By requiring that waste be collected weekly and by restricting times when waste containers could be curbside, the city was also concerned with preventing eyesores. This is a legitimate governmental interest. *Hudson v. Albrecht, Inc.* (1984), 9 Ohio St.3d 69, 9 OBR 273, 458 N.E.2d 852. As was noted, the present case illustrates the very reasons for passing such legislation. Not only is the nearly continuous presence of trash bags filled with food and other debris unsightly, the potential for health hazards is obvious. In this context, we see no fundamental constitutional freedom that is being unreasonably restricted by the ordinance.

■ Based on the above discussion, we reject Pullins's vagueness challenge to Section 919.051. We also reject the claim that the ordinance is overbroad, since the overbreadth doctrine is inapplicable to criminal statutes outside the First Amendment context. See, *e.g., State v. Collier* (1991), 62 Ohio St.3d 267, 272, 581 N.E.2d 552, 555–556. Specifically, Pullins has not alleged any way in which the rights guaranteed by the First Amendment have been affected.

In light of the above analysis, the first assignment of error is overruled.

## II

■ In the second assignment of error, Pullins contends that the trial court erred in admitting hearsay testimony under the business-record exception to the hearsay rule. In this context, the trial court allowed a Rumpke employee to testify that Rumpke picked up ten bags of trash at the Plum Street property on the Friday before June 2, 1997, and left eight bags of trash. The individual who testified was Bob Thompson, the residential manager for Rumpke who handles residential pickup for a number of locations, including Springfield. Thompson's job duties include establishing guidelines for trash pickup as well as monitoring pickup. He explained that the drivers, who are under his direct supervision, keep records to document the number of bags that are not picked up. When the drivers return from their routes, they give the records to Thompson, who then reviews them. After Thompson reviews the records, he gives them to customer service, for filing. For purposes of testifying, Thompson obtained copies of the records from customer service. From Thompson's testimony, it is apparent that Rumpke's normal practice is to keep records in this way.

The driver who actually made the notation was not called to testify. Instead, Thompson looked at the records to determine how many bags of trash were left at the Plum Street property. At trial, Pullins's counsel objected, claiming that allowing hearsay evidence on this crucial issue interfered with Pullins's right of

confrontation. The trial court disagreed, and admitted the evidence under the business records exception to the hearsay rule. This exception, found in Ohio Evid.R. 803(6) states:

"The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

" * * *

"(6) Records of regularly conducted activity

"A memorandum, report, record, or data compilation, in any form, of acts, events, or conditions, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness or as provided by Rule 901(B)(10), unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness."

In *State v. Dever* (1992), 64 Ohio St.3d 401, 596 N.E.2d 436, the Ohio Supreme Court held that "[t]he admission into evidence of a hearsay statement pursuant to a firmly rooted hearsay exception does not violate a defendant's right of confrontation." *Id.* at 401, 596 N.E.2d at 438 (following *White v. Illinois* (1992), 502 U.S. 346, 112 S.Ct. 736, 116 L.Ed.2d 848). Because the court decided that the hearsay exception in Evid.R. 803(4) was firmly rooted, the court also found that statements made by a young sex offense victim during treatment could be admitted without denying the defendant's right of confrontation.

Like Evid. R. 803(4), the hearsay exception for business records in Evid. R. 803(6) is a firmly rooted doctrine. See, *e.g., Leonard v. State* (1919), 100 Ohio St. 456, 127 N.E. 464 (discussing "shop-book" entries); *Weis v. Weis* (1947), 147 Ohio St. 416, 34 O.O. 350, 72 N.E.2d 245; and *Green v. Cleveland* (1948), 150 Ohio St. 441, 38 O.O. 311, 83 N.E.2d 63. As was noted in *Weis:*

"The exception to the hearsay rule of evidence in such cases is based on the assumption that the records, made in the regular course of business by those who have a competent knowledge of the facts recorded and a self-interest to be served through the accuracy of the entries made and kept with knowledge that they will be relied upon in a systematic conduct of such business, are accurate and trustworthy. In other words, such records are accepted as accurate and trustworthy, until inaccuracy is shown, upon faith in the routine by which and in the purpose for which they are made." 147 Ohio St. at 425–26, 34 O.O. at 354, 72 N.E.2d at 250.

Because the business-records exception is firmly rooted, admitting the Rumpke business records did not interfere with Pullins's right to confront witnesses.

■ However, even if the evidence had been erroneously admitted, any error would have been harmless. See Evid.R. 103(A) and Crim.R. 52(A). Specifically, no substantial right was affected since the testimony of the Rumpke employee about the number of bags left on Pullins's property was merely cumulative evidence. For example, the neighbor who filed the complaint testified that some trash was not picked up on Friday and that several bags were still there on the following Monday (June 2, 1997). Additionally, the sanitarian from the health district testified that about a half dozen trash bags were sitting on the curb when he investigated on Monday. Furthermore, Pullins did not deny that trash was left at the curb due to the ten-bag limit. To the contrary, Pullins testified that if trash was on the premises when the health department went out, that may have meant that Rumpke did not pick up all the trash.

Based on the preceding discussion, we find no error in the trial court's admission of evidence under Evid.R. 803(6). Accordingly, the second assignment of error is overruled.

### III

■ The third assignment of error is based on Pullins's claim that the judgment of conviction was against the manifest weight of the evidence. In this regard, Pullins claims that the city failed to prove that the trash bags left on the property came from the premises or that someone other than a licensed collector hauled the trash away at the time in question. Because 919.051 is a strict liability ordinance, Pullins contends that the city has to prove that Pullins or his tenants were responsible for placing the trash on the property. In order for the city to meet this burden, Pullins suggests that the city must call in the tenants and have them specifically identify trash, including type and quantity, that they placed at the curb. In the alternative, the city must call witnesses who could testify to the same matters, including observation of tenants placing the trash at the curb.

■ As a preliminary matter, we fail to see a connection between how charges are characterized and how they are proven. In other words, we see no relationship between the state of mind required for a particular crime and whether the charge is proven by direct as opposed to circumstantial evidence. A strict liability statute imposes liability regardless of the actor's purpose. Instead of showing motive, the state "need only prove that the accused engaged in a voluntary act or an omission to perform an act or duty which he is capable of performing." *State v. Squires* (1996), 108 Ohio App.3d 716, 718, 671 N.E.2d 627, 629. What Pullins appears to be suggesting is that where criminal liability is imposed regardless of intent, the prosecution should be held to a more restrictive means of proving its case, *i.e.*, the state must prove the charge by direct evidence

rather than relying on circumstantial evidence. However, Pullins's premise is fundamentally flawed because these kinds of evidence have equal value. See *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492 (holding in syllabus that "[c]ircumstantial evidence and direct evidence inherently possess the same probative value and therefore should be subjected to the same standard of proof"). Consequently, the fact that the city's case was based on circumstantial evidence does not mean we should scrutinize it differently. Instead, the normal tests used to evaluate manifest-weight claims should be applied.

Under the manifest-weight standard, "judgments supported by competent, credible evidence going to all the material elements of the case must not be reversed as being against the manifest weight of the evidence." *Cent. Motors Corp. v. Pepper Pike* (1995), 73 Ohio St.3d 581, 584, 653 N.E.2d 639, 642, citing *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578. Weight of the evidence is defined as " 'the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief.' " *State v. Thompkins* (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541, 546, quoting Black's Law Dictionary (6 Ed.1990) 1594.

Our ability to weigh the evidence is limited because "the trial judge has the best opportunity to view the demeanor, attitude, and credibility of each witness, something that does not translate well on the written page." *Davis v. Flickinger* (1997), 77 Ohio St.3d 415, 418, 674 N.E.2d 1159, 1162. As a result, "[a] reviewing court should not reverse a decision simply because it holds a different opinion concerning the credibility of the witnesses and evidence submitted before the trial court." *Id.* at 419, 674 N.E.2d at 1163.

After reviewing the evidence, we find competent, credible evidence to support Pullins's conviction. The ordinance states that the owner of real property must provide for the removal of all trash from the premises by a licensed hauler. Pullins did not comply with the ordinance because he contracted for the removal of only ten bags of trash, which was not adequate. Furthermore, we do not believe that the city was required to prove its case by having eyewitnesses itemize and identify individual bags of trash as having been deposited at the curb by tenants at 303 South Plum Street. The city did present the testimony of a neighbor who said she saw trash that was put out for Friday pickup and had not been removed by Monday. This witness also denied seeing anyone else in the neighborhood ever put bags of trash on the South Plum property, and indicated

that the problem with insufficient trash pickup had been ongoing for some time. Finally, Pullins admitted that at times when his employees went to the Plum Street property, trash was still remaining at the curb. Significantly, Pullins did not offer any testimony to dispute the fact that trash was on the property at the time the health district visited. Although Pullins testified that he felt his ten-bag arrangement with Rumpke was sufficient to take care of the premises, the trial court was justified in finding otherwise. Based on the preceding discussion, we find the third assignment of error without merit.

In light of the above analysis, appellant's three assignments of error are overruled, and the judgment of the trial court is affirmed.

*Judgment affirmed.*

WOLFF and FAIN, JJ., concur.